SHEPHERD, J.,
dissenting.
The court today opens a new frontier in insurance litigation of benefit only to the legal profession.
The insurance contract in this case expressly states the insurer has “the right and the duty to defend the insured” against any suit to which the insurance applies. The insurer appointed the law firm of Hyman and Kaplan to defend both Magicamp and the University of Miami. Without providing Great American the courtesy of a phone call or demand, the Isicoff law firm declared conflict and appointed itself. The majority affords them fees for their trouble. The future of dual insured claims should not be hard to see.
Rule 4-1.7 of the Florida Rules of Professional Conduct states “a lawyer shall not represent a client if: (1) the representation of 1 client will be directly adverse to the other client; or (2) there is a substantial risk that representation of 1 or more clients will be materially limited by the lawyer’s responsibility to another client.” R. Regulating Fla. Bar 4-1.7. However, the rule is not slavishly applied. As the comment to the rule states, “A possible conflict does not itself preclude the representation.” R. Regulating Fla. Bar 4-1.7 cmt. That is the applicable point in this case.
The complaint in the underlying case alleged that Magicamp was negligent in failing to properly monitor, supervise, and care for Daniel Seguróla, a camper in its care, causing him to nearly drown. The University also was sued on the ground that its pool lifeguards failed to properly supervise the pool.
Magicamp had no defense to the lawsuit. A child entrusted to Magicamp nearly drowned in an area of the pool being used by it. The “Revocable Agreement for Use of University Facilities,” pursuant to which Magicamp was licensed to use the pool, stated, in paragraph P, “User shall be solely responsible for the safety and welfare of its agents, employees, guests and the attending public.” Magicamp also assumed “full financial responsibility for” (emphasis added), and agreed to “release, *509 indemnify and hold harmless the University of Miami, its Trustees, officers, employees and agents from and against all losses, claims, demands, damages, actions or causes of action of whatsoever kind and nature, liability and expense, including attorney fees arising out of injury or death to persons or damage to property connected with or arising out of the use of [the] facility or activities of [the] User.” After seven years of litigation — there were unusually lengthy periods of inactivity by plaintiffs counsel — the case settled. The University suffered no loss.
“A conflict of interest between jointly represented clients occurs whenever their common lawyer’s representation is rendered less effective by reason of his representation of the other.” Spindle v. Chubb/Pacific Indem. Grp., 89 Cal.App.3d 706, 713, 152 Cal.Rptr. 776 (1979). Furthermore, “the difference in the potential for liability [between] two insureds, standing alone, does not necessarily result in an actual conflict of interest between them so far as their joint defense is concerned.” Id. at 713-14, 152 Cal.Rptr. 776. In this case, there was neither an actual conflict nor a “substantial risk” of conflict. The parties were united in the defense against the plaintiff from the moment the Isicoff law firm appeared in the litigation through settlement. Neither party filed a claim against the other.
Although there was no actual conflict between the parties during the course of the underlying litigation, the University urges a determination of need for separate counsel should be treated just as the duty to defend. The analogy is flawed. The duty of a liability insurer to defend is contractual in nature and ordinarily is determined, in the first instance, by comparing the language of the insurance contract and allegations of the petition or complaint in the action brought by the person injured or damaged against the insured. Lincoln Ins. Co. v. Home Emergency Servs., Inc., 812 So.2d 433, 435 (Fla. 3d DCA 2001). However, the question in this case is not one of duty to defend. The only question is who will do the defending.
The University’s answer to this question resides in a paper conflict. Counsel for each party preserved the right to seek contribution or indemnity from the other in its answer and affirmative defenses. However, as University counsel admitted at oral argument, neither the University nor Magieamp sought to prove liability of the other at any time during the course of the underlying litigation. As both knew, such a course almost certainly would have been fatal. See Oda v. Highway Ins. Co., 44 Ill.App.2d 235, 194 N.E.2d 489, 496 (1963) (“A traditional truism among lawyers is that nothing can be more ruinous to the defense of cases such as the personal injury cases here involved than for one defendant to seek to prove the liability of the other. On such occasions the plaintiffs lawyer sits by and watches the show as one defendant slaughters the other, while the court, observing the spectacle, meditates on the folly of the defendants in not having agreed on a policy of cooperation, even though it meant that each had to assume some degree of risk thereby.”). Thus, there was no real conflict and no need for self-appointed counsel.[6]
*510 The cases cited by the majority do not require a different result. For example, in Williams v. American Country Insurance Co., 359 Ill.App.3d 128, 295 Ill.Dec. 765, 833 N.E.2d 971 (2005), a police officer sued a taxi driver and his employer, Yellow Cab, for injuries sustained when the driver, exhibiting a pique of anger over a Chicago traffic jam, dragged the officer, who had leaned inside the cab, fifteen feet along a congested city street. Id. at 973. The policy expressly excluded “ 'bodily injury’ ... expected or intended from the standpoint of the ‘insured.’ ” Id. at 974. In an earlier appeal, the Illinois First District Court of Appeal determined the taxi driver’s conduct was intentional as a matter of law. Am. Country Ins. Co. v. Williams, 339 Ill.App.3d 835, 274 Ill.Dec. 857, 791 N.E.2d 1268, 1278 (2003). However, under Illinois law, the driver would be entitled to coverage nevertheless if “his intentional, negligent or criminal acts were performed within the scope of employment.” Am. Country, 295 Ill.Dec. 765, 833 N.E.2d at 976. American Country disputed that coverage existed under this alternative. The issue had to be resolved by a special verdict interrogatory during the course of the underlying liability trial. Unlike the case before us, the conflict in this case was not a paper conflict. It was an actual conflict. Id. at 980. See also Golotrade Shipping & Chartering, Inc. v. Travelers Indem. Co., 706 F.Supp. 214, 219 (S.D.N.Y.1989) (“It is important to recognize that independent counsel is not necessary in all cases where multiple claims are made. It is only necessary where the “question of insurance coverage is ... intertwined with the question of the insured’s liability.”) (quoting Pub. Serv. Mut. Ins. Co. v. Goldfarb, 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810, 815, n* (N.Y.App.Div.1981)).
Bituminous Insurance Cos. v. Pennsylvania Manufacturers’ Association Insurance Co., 427 F.Supp. 539 (E.D.Pa.1976), cited by the majority, is similar. There, the insurer of a subcontractor, Pennsylvania Manufacturers’, was ordered to provide a defense to a general contractor pursuant to an indemnity provision in a construction contract, including independent defense counsel if such became necessary to avoid a conflict of interest, where some, but not all, of the claims made against the general contractor were indemnified claims covered under the Pennsylvania Manufacturers’ insurance policy. Id. at 542. As in Williams, the conflicts between insurer and insured were real and imminent. See also U.S. Fid. & Guar. Co. v. Louis A. Roser Co., 585 F.2d 932, 941 (8th Cir.1978) (conflict between insurer and insured over covered and non-covered claims required insurer to reimburse insured for services of independent counsel to protect insured’s interest in maximizing coverage in underlying litigation); accord Travelers Indem. Co. of Ill. v. Royal Oak Enters. Inc., 344 F.Supp.2d 1358, 1365-66 (M.D.Fla.2004).[7] The case offers no solace to the majority.
Finally, Wolpaw v. General Accident Insurance Co., 272 N.J.Super. 41, 639 A.2d 338 (1994), likewise offers no assistance to the majority. There, defense counsel undertook the representation of three per *511 sons — a homeowner, sister, and eleven-year-old nephew of the homeowner — insured through a homeowner’s policy of insurance issued by General Accident Insurance Company, in an accidental shooting case. Like our case, each defendant had an interest in minimizing the amount of the shooting victim’s judgment and maximizing the percentage of fault attributable to the other defendants. Id. at 340. However, unlike our case, the Wolpaw case went to trial and apportionment of negligence was done by the jury. Id. at 339-40. It was obvious to the appellate court, as it would have been to us, that single defense counsel could not adequately represent all three insureds on the apportionment issue. Moreover, there was a significant exposure in the case for an excess judgment for which all three insureds might be found, and ultimately were found, responsible. Id. at 340. Wolpaw is another case of actual conflict.
In contrast, I find Spindle, 89 Cal. App.3d at 706, 152 Cal.Rptr. 776, cited in the briefs of both parties in this case, but overlooked by the majority, to be more informative. Spindle arises out of a medical malpractice action brought by a patient, Betty Burke, against two physicians, Dr. David K. Spindle and Dr. Chester C. McReynolds, both of whom carried malpractice insurance from the same insurer, Chubb/Pacifie, albeit in different policy limits — one million dollars in the case of Dr. Spindle and $500,000 on Dr. McRey-nolds. Id. at 709, 152 Cal.Rptr. 776. Like Magicamp in the case before us, Dr. McReynolds had a much greater potential for liability than did Dr. Spindle. As in our case, Chubb/Pacific assigned the same defense counsel to defend both doctors. Id. at 714, 152 Cal.Rptr. 776. After a jury trial, Ms. Burke obtained a joint and several judgment in the amount of $404,000 against both Dr. Spindle and Dr. McRey-nolds.
Dr. Spindle then sued Chubb/Pacific, alleging the company had committed fraud and bad faith by advising him soon after suit was filed that “there appeared to be no conflict of interest between the two doctors in the lawsuit and that it would be more economical for them to share the costs of their defense rather than to have each represented by separate counsel.” Id. at 709, 152 Cal.Rptr. 776. According to Spindle, this representation was false because Chubb/Pacific then knew (but Dr. Spindle did not) the interests of the two insureds conflicted in that (1) they had different maximum amounts of insurance protection; (2) defendant had reinsured them differently — for Dr. Spindle, everything above $25,000; for Dr. McReynolds, everything above $200,000; and (3) their respective potentials for liability differed. Id. at 710, 152 Cal.Rptr. 776. According to Dr. Spindle, Plaintiff Burke would have settled the entire underlying case for $350,000 and, prior to trial, Dr. McRey-nolds had directed Chubb/Pacific to do so. Id. Spindle sought at least $2,043,000 specified compensatory damages (primarily emotional distress) because of Chubb/Pa-cific’s improper joint defense of him in the underlying action. Id.
The California Second District Court of Appeal found no actionable impropriety in the joint representation. As to the fraud count, the court concluded, “What plaintiff [Dr. Spindle] has done is to confuse divergence of interest with conflict of interest.” Id. at 713, 152 CaLRptr. 776. The court explained:
Conflict of interest between jointly represented clients occurs whenever their common lawyer’s representation of the one is rendered less effective by reason of his representation of the other. Nothing like this is alleged in the fraud count. The difference in the per *512 sonal exposure of the two insureds resulting from the difference in their maximum coverage, by itself and without more, creates no actual conflict of interest between them in the matter of their joint representation. The same may be said of the difference in them reinsurance situations since reinsurance is a matter ordinarily of concern only to the insurer. Similarly the difference in the potential for liability of the two insureds, standing alone, does not necessarily result in an actual conflict of interest between them so far as their joint defense is concerned.
Id. at 713-14, 152 CaLRptr. 776 (emphasis added).
As to the bad faith claim, which was based on alleged breaches similar to those alleged in the fraud count,[8] the court concluded:
Plaintiff has not stated a cause of action for bad faith in any of these alleged breaches. We have already dealt with the absence of any actual conflicts of interest between the two doctors affecting the effectiveness of their joint representation in the Burke case. It is a well known fact that under insurance policies generally the insurer controls the defense it provides its insured. We see nothing improper in this customary practice. It is true that the trial memoranda between Kirtland & Packard and defendant, which plaintiff incorporated in this count, show that Dr. McReynolds had a much greater potential for liability than plaintiff, but plaintiff has not alleged how this disparity in potential liability affected in any way the joint defense defendant provided him.
Id. at 714-15, 152 Cal.Rptr. 776 (emphasis added). Similarly in the case before us, the University of Miami has not alleged (or shown) how the disparity in potential liability between it and Magicamp affected in any way the joint defense provided it under the Great American policy.[9]
The flaw in the majority opinion is that it confuses and conflates insurer obligations in three unrelated circumstances: (1) the duty to defend; (2) conflicts between an insured and insurer; and (3) conflicts between insureds. The case before us involves the third circumstance. The majority makes no effort to distinguish among them in its resolution of this case. Instead, it begins its analysis with the global pronouncement, “the rights or duties applicable to the first named insured, Magicamp, [must be] applied as if each named insured were the only named *513 insured and applied separately to each insured against whom a claim was made.”[10] Implicit in the statement is that each insured gets its own lawyer, almost no matter the circumstance. The premise presages the conclusion: “UM is entitled to be indemnified for attorney’s fees and costs in the action.” See supra Majority Op. p. 2.
The syllogism is a false one. The majority fails to appreciate that liability insurance involves the delicate merging of the duty to indemnify and the right to defend. See Kent D. Syverud, What Professional Responsibility Scholars Should Know About Insurance, 4 Conn. Ins. L.J. 17, 21 (1997). The majority opinion divides the two by affording dual insureds separate counsel any time an insured articulates a conflict in a pleading, whether or not real. However, unlike the duty to defend, allegations in a complaint or answer, such as the answer filed sua sponte by the Isicoff law firm, preserving the University’s right to seek contribution or indemnity from Magi-camp, are not controlling when actual facts demonstrate the existence or non-existence of an obligation to provide separate counsel. See Louis A. Roser Co., 585 F.2d at 986. In the case before us, the conflict was not real or actual. The Isicoff firm followed and supported counsel appointed by Great American throughout the underlying litigation.
Liability insurance is a relatively new product, not much older than the automobile. A liability insurer’s contractual right to control the defense and indemnity features of its contract is indispensable to the protection of its financial interest in the litigation and thus the product itself. See Royal Oak, 344 F.Supp.2d at 1374. This meaningful contractual right should not be penalized merely because there exists the potential for insurer-selected counsel to become impermissibly conflicted in its representation. Yet, that is what the majority does in the opinion this court issues today. See id. I am persuaded the rules governing the Florida Bar and the attendant threat of malpractice liability provide sufficient assurance that counsel appointed by an insurer will not continue to represent an insured in the event a conflict of interest interferes with counsel’s ability to make independent professional judgments on behalf of the client. See id.
I would affirm the order under review.

. The majority mistakenly suggests that at some point in the underlying litigation, not later than trial, insurer-appointed counsel "would have had to argue” the other was liable. That is not so. If the underlying case had been tried, the only necessary special jury interrogatories would be one, each asking whether each defendant was legally responsible for the accident. The statute of limitations does not begin to run on the apportionment claims in the case — contractual indemnity and contribution — until the conclu *510 sion of the underlying case either by settlement or judgment. See Kala Invs., Inc. v. Sklar, 538 So.2d 909, 915-16 (Fla. 3d DCA 1989).

. In fact, in Royal Oak, the United States District Court for the Middle District of Florida opined that despite the fact Royal Oak is an actual conflict case — arising out of the addition of a non-covered intentional tort count and punitive damage claim to an existing wrongful death complaint — the Florida Supreme Court still would not require the appointment of insurer-paid independent counsel. Royal Oak, 344 F.Supp.2d at 1375.

. In his bad-faith claim, Dr. Spindle incorporated his fraud count and additionally alleged Chubb/Pacific breached its contractual obligation to him to act in good faith and deal fairly with him in (1) failing to advise him of the alleged conflicts of interest previously alleged in the fraud count; (2) not providing him with separate counsel; (3) controlling joint defense counsel in that case; and (4) refusing to settle the liabilities of both code-fendants in that case for the sum of $350,000 from the McReynolds' policy alone. Id. at 714, 152 Cal-Rptr. 776.

. Although not necessarily determinative, it at least is noteworthy that the Great American policy limit insuring both Magicamp and the University of Miami for this occurrence was $1,000,000, and the University of Miami had substantial coverage of its own in excess of the Magicamp limits. The underlying case settled within the Great American policy limit. Even where there might be inadequate limits, however, the usual defense strategy is to defer contribution or indemnity claims until the liability case is concluded. See Allan D. Windt, "Insurance Claims & Disputes: Representation of Insurance Companies & Insureds,” 1 Insurance Claims and Disputes 5th, § 4:23 (2012); see also Wolpaw v. Gen. Accident Ins. Co., 272 N.J.Super. 41, 639 A.2d 338 (1994) (discussing methods for resolving such claims after the liability case is concluded).

. The majority seeks to ground this statement in Section IV of the policy. See supra Majority Op. p. 3 & note 2. A casual perusal of Section IV reveals it merely begs the issue presented by this appeal.